[No. 26602. Department One. April 27, 1937.]

THE STATE OF WASHINGTON, *on the Relation of Mountain Development Company et al., Plaintiff,* v. THE SUPERIOR COURT FOR PIERCE COUNTY *et al., Respondents.*[1]

[1]Reported in 67 P. (2d) 861.

*W. E. Heidinger,* for relators.

*Harry H. Johnston, John E. Belcher, B. Gray Warner,* and *Charles C. Ralls,* for respondents.

MILLARD, J.—On or about December 23, 1936, Pierce county and King county jointly commenced an action in the superior court for Pierce county, entitled:

"Pierce County, Washington, on the relation of Harvey O. Scofield, John Schlarb, and A. A. Rankin, as the Board of County Commissioners of said Pierce County, and King County, Washington, on the relation of Jack Taylor, Louis Nash and John C. Stevenson, as the Board of County Commissioners of said King County, Petitioners, vs. Mountain Development Company, a corporation, Saint Paul and Tacoma Lumber Company, a corporation, and Weyerhaeuser Timber Company, a corporation, Respondents,"

the purpose of which was to acquire, by condemnation, certain described lands of the respondents in Pierce county.

On January 4, 1937, the date set for hearing on the above described petition, the respondents appeared, objected to the introduction of any testimony, and moved for the dismissal of the action, on the ground that the petition did not state facts sufficient to constitute a cause of action; that the petitioners had no legal capacity to sue, nor right to maintain the action; and that there was a defect and misjoinder of parties plaintiff. The trial court announced:

"I hold that the complaint does not state a cause of action and will sustain the objection and grant the motion allowing an exception."

On January 12, 1937, a formal order of the trial court denying the motion of respondents for judgment of dismissal and granting permission to the petitioners to amend the petition was entered. Thereupon, the two counties filed in the cause an amended petition entitled the same as the original petition. The same objection and motion directed against the original petition were urged by the respondents against the amended petition. The objection of the respondents was denied, and their motion overruled.

Separate answers were filed by respondents to the amended petition. Evidence was introduced on behalf of the two counties. The respondents did not offer any evidence. The court entered an order adjudicating the taking of the land and other property described, for the purpose of establishing and maintaining the same as a dam site for the two counties, to be a public use and necessity, and directed that a jury be impaneled to determine the compensation to be made in money to the owners interested, for the taking and injuriously affecting their lands for the dam site in Pierce county known as the Mud Mountain dam. April 12, 1937, was the date set for the hearing and trial of the petition to ascertain and determine the compensation to be made in money to the owners and other persons interested therein for the taking and injuriously affecting the lands described.

The Mountain Development Company and the Weyerhaeuser Timber Company, by certiorari, seek, in this court, review of the adjudication of public use and necessity.

■ Counsel for relators first urges as error permission granted to the two counties to amend their

petition after the trial court had sustained an objection to the introduction of any testimony and granted the motion for the dismissal of the action.

When the cause was called for trial on the original petition, the following occurred:

"Mr. Heidinger: The defendants each appearing separately, the Mountain Development Company and the Weyerhaeuser Timber Company, by myself, and the St. Paul & Tacoma Lumber Company appearing by Grosscup, Morrow & Ambler, by Mr. Hughes, separately object to the introduction of any evidence in this case, and move for a dismissal of the action, on the ground and for the reason that the complaint does not state facts sufficient to constitute a cause of action or to entitle the petitioners to the relief prayed for, or to any relief.

"Mr. Belcher: I am ready on the demurrer.

"The Court: That is a general demurrer, in effect. I will hear you on the demurrer.

"Mr. Hughes: I join in the demurrer on behalf of the St. Paul & Tacoma Lumber Company.

"(Argument.)

"The Court: It seems to me that without something being done to authorize two counties to join in one condemnation action, it is not proper.

"Mr. Belcher: Well, I have no objection to King County being stricken.

"The Court: I doubt Mr. Belcher's authority to dismiss in behalf of King County, both counties appearing by separate counsel. I hold that the complaint does not state a cause of action, and will sustain the objection and grant the motion, allowing an exception."

The trial court, after making an oral decision, may change its mind and enter a formal written order contrary to such oral decision. That rule needs no citation of sustaining authority. That the court may permit the filing of an amended petition, as was done in this case, is clear. Rem. Rev. Stat., § 303 [P. C. § 8336].

■ Counsel for relators next contends that two counties may not jointly maintain an action to acquire property by condemnation unless expressly authorized by statute to do so. It is argued that such authorization does not exist unless it is found in § 4 of chapter 54, Laws of 1913, p. 159 (Rem. Rev. Stat., § 9654 [P. C. § 5951]), and that no such authority is found therein. It is urged that the proceedings must be in the name of the county in which the property to be acquired is situate.

"When such a contract shall have been entered into the power of eminent domain is hereby vested in each of such counties, to acquire any lands necessary to straighten, widen, deepen, dike or otherwise improve any such river, its tributaries or outlet or to strengthen the banks thereof, or to acquire any land adjacent to such river, or its tributaries, or the right to cut and remove timber upon the same for the purpose of preventing or lessening the falling of timber or brush into the waters of such river or tributaries, or to acquire any rock, quarry, gravel deposit or timber for material for the prosecution of such improvement, together with the necessary rights of way for the same. Any such land, property or rights may be acquired by purchase instead of by condemnation proceedings. Said right of eminent domain shall extend to lands or other property owned by the state or any municipality thereof. The title to any such lands, property or rights so acquired shall vest in the county in which situate for the benefit of such enterprise and said fund, but when said contract shall have terminated by lapse of time or for any other reason, then such title shall be held by such county independent of any claims whatsoever of the other county, but any material, equipment or other chattel property on hand shall be converted into money and the money divided between the two counties in the ratio of their respective contributions to the fund. The exercise of such rights of eminent domain or purchase shall rest in the joint control of the two boards of county commissioners. Such eminent domain proceedings shall be in the name

of and had in the county where the property to be acquired is situate, provided if either county shall fail or refuse to institute and prosecute any condemnation proceedings when directed so to do by any legal meeting provided for in section 9655, such proceeding may be instituted and prosecuted by and in the name of the other county. The proceedings may conform to the provisions of sections 921 and 926, inclusive, of this code, or to any general law now or hereafter enacted governing eminent domain proceedings by counties. The awards in and costs of such proceedings shall be payable out of such funds. The purposes in this act specified are hereby declared to be county purposes of each and both of such counties." Rem. Rev. Stat., § 9654 [P. C. § 5951].

Each county having been granted the power of eminent domain to acquire property necessary for flood control, and like purposes, both counties are vested with the power of eminent domain and may exercise it together to carry out the purpose of their contract. This position is sustained by Rem. Rev. Stat., § 9660 [P. C. § 5957], reading as follows:

"Whenever two counties of this state, acting under a contract made pursuant to sections 9651 to 9659, shall make an improvement in connection with the course, channel or flow of a river, shall acquire property by statute, purchase, gift or otherwise, said counties, acting through their boards of county commissioners jointly shall have the power, and are hereby authorized to sell, transfer, trade, lease, or otherwise dispose of said property by public or private, negotiation or sale. The deeds to the property so granted, transferred, leased or sold shall be executed by the chairman of the meeting of the joint boards of county commissioners, and attested by the secretary of said joint meeting where the sale is authorized. The proceeds of the sale of said property shall be used by said counties for the carrying on, completion or maintenance of said improvement, as directed by the boards of county commissioners of said counties acting jointly." Rem. Rev. Stat., § 9660 [P. C. § 5957].

■ Counsel for relators next insists that the county may not maintain an action "on the relation" of their county commissioners. It is true, as counsel argues, that the statute (Rem. Rev. Stat., § 9654 [P. C. § 5951]) expressly provides that the "proceedings shall be in the name of and had in the county where the property to be acquired is situate." To each county the state has delegated the sovereign power of eminent domain. If either county failed or refused to institute and prosecute condemnation proceedings, as the act provides, such proceedings may be instituted and prosecuted by and in the name of the other county. A complete answer to the position of counsel for relators is that everything in the caption, except the name of the counties, may be treated as surplusage, and the action would then be brought in the name of the two political subdivisions to which the state had delegated the power of eminent domain.

■ Counsel for relators next complains that the amended petition does not state facts sufficient to constitute a cause of action. It is argued that the power of eminent domain is not vested in either county until the two counties have entered into a contract containing the provisions required by §§1, 3 and 4, chapter 54, Laws of 1913, pp. 156, 158, 159 (Rem. Rev. Stat., §§ 9651, 9653, 9654 [P. C. §§ 5948, 5950, 5951]). It is insisted that nothing is alleged in the amended complaint to indicate, even by inference, that the contract pleaded contains any of the provisions required by the statute; that, having failed to allege compliance with the statute, obviously the petition fails to state facts sufficient to constitute a cause of action or to authorize the counties to maintain the condemnation proceedings.

Rem. Rev. Stat., § 9654 [P. C. § 5951], one of the three pertinent sections of the statute, is quoted

above. The other two pertinent sections read as follows:

"Wherever and whenever a river is or shall be the boundary line or part of the boundary line between two counties, or it, or its tributaries or outlet or part thereof, flows through parts of two counties, and the waters thereof have in the past been the cause of damage, by inundation or otherwise, to the roads, bridges or other public property situate in or to other public interests of both such counties, or the flow of such waters shall have alternated between the said counties so at one time or times such waters shall have caused damage to one county and at another time or times to the other county, and if it shall be deemed by the boards of county commissioners of both counties to be for the public interests of their respective counties that the flow of such waters be definitely confined to a particular channel, situate in whole or in part in either county, in a manner calculated to prevent such alternation or to prevent or lessen damage in the future, it shall be lawful for the two counties, and their boards of county commissioners are hereby empowered, pursuant to resolution, to enter into a contract in writing in the names of the respective counties for the purpose of settling all disputes in relation to any such situation, and providing ways and means for the control and disposition of such waters. Any such contract may provide:

"(a) That it shall be operative in perpetuity, or only for a term of years or other measure of time to be specified therein.

"(b) The amount of money to be expended by each county during each year of the life of said contract, or such other method of determining the amount of expenditure or dividing the financial burden as may be agreed upon.

"(c) That an annual tax shall be levied, at the same time and in the same manner as other county taxes are levied, each year during the life of the contract, by the county commissioners of each county. The annual tax herein provided for need not be levied at the same rate for each county, but shall be at such

rate in each county as will produce annually the amount of money for each county as is required for the fulfillment of the contract on its part: Provided, however, that in no event shall any such tax levy by either county exceed one mill on the dollar for any one year.

"(d) That the general scheme for the improvement of such river shall be as stated in such contract, but by consent of the contracting parties, pursuant to resolution of each board of county commissioners, such scheme may be modified from time to time during the life of the contract. The contract may but need not provide the details of such scheme, but must designate the general purpose to be accomplished. So far as details are not specified in the contract, same shall be for future determination by joint action of the two boards of county commissioners. Any such contract may be subsequently modified or abrogated by mutual consent evidenced by separate resolution of both boards of county commissioners." Rem. Rev. Stat., § 9651 [P. C. § 5948].

"When such a contract shall have been entered into it shall be the duty of each of the boards of county commissioners to make for their respective counties, each year, a tax levy at a rate sufficient to meet the requirements of the contract to be performed by the county, or sufficient to provide such lesser amount as the boards of county commissioners shall agree upon for such year, to be evidenced by separate resolution of each board, and when such levy shall be made the same shall be extended upon the tax-rolls of the county levying the same as other taxes shall be extended, and shall be collected in the same manner and shall be a lien upon the property as in the case of other taxes. The fund realized in each county by such tax levy shall go into a separate fund in the treasury of the county collecting the same, to be designated inter-county river improvement fund, and the entire fund so collected in the two counties shall be devoted to and be disbursed for the purposes specified in such contract and as in this act provided, and for no other purpose, but without regard to the particular county in which the work is performed,

material required or expenditure made, it being the intent that the entire fund realized in the two counties shall be devoted to the one common purpose as if the two counties were one county and the two funds one fund. The fund in each county shall be disbursed by the county treasurer of such county upon warrants signed by the county auditor of that county. Such warrants shall be issued by order of the board of county commissioners of such county, or a majority thereof. Each county auditor shall, whenever requested by the county auditor of the other county, furnish the county auditor of the other county a statement of payments into and warrants drawn upon the fund of his county from time to time, and in addition thereto, each county auditor shall on the first Monday of January, April, July and October each year during the life of the contract furnish the other a complete statement thereof. Obligations incurred in the prosecution of such improvement and warrants issued shall be payable only out of said special funds, and no general obligation against or debt of either county shall be created thereby or by any contract entered into by virtue of this act, but it is not the intent of this act to deny to either county the right to have in the courts any proper proceeding to compel compliance with such contract on the part of the other county." Rem. Rev. Stat., § 9653 [P. C. § 5950].

The amended petition alleges that the two counties are duly and regularly organized and existing counties of the state of Washington, and that, pursuant to the provisions of the laws of the state of Washington, the two counties, in January, 1914, through their respective boards of county commissioners, entered into a written contract for a period of fifty years, by the terms of which the two counties jointly agreed to form, and did form, an inter-county river improvement commission for the control of the White, Puyallup and Stuck rivers, being rivers forming the boundary lines between the two counties.

It is further alleged that the respective boards of

county commissioners of the two counties, prior to the filing of this petition, by proper resolutions, directed the prosecuting attorney of each of the two counties to initiate actions to acquire, by condemnation, certain lands described in the complaint for the purpose of acquiring title to such lands, the title to vest in Pierce county for the construction of a dam on the White river at a point approximately six miles north of Buckley for the purpose of controlling the flood waters of the White river, the Stuck river and the Puyallup river, and that the lands are necessary to carry out the purposes of the inter-county river improvement. The necessity of the acquisition of the land described in the carrying out of the work is also alleged.

The purpose of the agreement entered into in 1914 between the two counties is to provide, under the terms of chapter 54, Laws of 1913, p. 156, Rem. Rev. Stat., §§ 9651-9654 [P. C. §§ 5948-5951], for the control of flood waters on rivers forming the boundary between the two counties. The period of time in which the contract shall be operative is specified in the contract. In fact, there is a substantial compliance with the provisions of the statute quoted. The contract recognizes that in the future there may be situations which, at the time of the making of the contract, were impossible of recitation in detail. The pertinent provision of the contract reads as follows:

"In this connection, it is recognized that only the actual doing of the work will develop how extensive and expensive the work must be to accomplish the result, and for that reason it is impossible to herein define in greater detail its definite features, and for the same reason it is intended that the details of the work shall be worked out by joint action of the two boards of county commissioners, as contemplated by said statute, and that the joint boards, in determin-

ing upon, controlling, and providing for the prosecution of the work and the expenditure of the construction funds, as authorized by said statute, may determine the character and design and extent of each feature of the construction work, it being, however, the common purpose of the two counties that the plan of the work shall be reasonable from the standpoint of cost and that no unnecessarily expensive scheme shall be adopted or carried out."

The county commissioners did, as the contract provides, determine the character and extent of each feature of the construction work, and, by resolution, concluded that the construction of a dam at Mud Mountain was one way of controlling floods. The legislature provided that, whenever a river or rivers constitute the boundary line between two counties and the waters thereof have theretofore caused damage, it shall be lawful for the two counties and their boards of county commissioners to enter into a contract in writing in the names of the respective counties to provide for the control of such flood waters, and for the purpose of settling all disputes in relation to any such situation, and providing ways and means for the control and disposition of such waters.

The statute provides the period of time the contract shall be operative and the other conditions of the contract, but it must be borne in mind that, while the statute provides that the general scheme for the improvement of such river shall be as stated in the contract between the two counties,

". . . by consent of the contracting parties, pursuant to resolution of each board of county commissioners, such scheme may be modified from time to time during the life of the contract. The contract may but need not provide the details of such scheme, but must designate the general purpose to be accomplished. . . ." Rem. Rev. Stat., § 9651 [P. C. § 5948].

The contract between the two counties recites in general that the purpose is flood control, and, after specifying certain things, provides (the provision is quoted above) that the details shall be worked out by joint action of the two boards of county commissioners, as contemplated by the statute. Pursuant to that contractual provision, the two counties proceeded, through their respective boards of county commissioners, to effectuate the purpose of the contract, mutually agreeing that, in the interest of flood control, the construction of a dam at Mud Mountain is necessary. Each county, acting separately and jointly through its board of county commissioners, passed the necessary resolutions to authorize the commencement of condemnation proceedings to acquire from the relators the property necessary upon which to construct the dam. It is clear that to accomplish the purpose of the plan outlined—control of the flood waters of the rivers forming the boundary between the two counties—the dam is necessary. Patently, the property sought to be condemned is required for a public use. However,

"The condemnor does not have to show an absolute necessity, but only a reasonable necessity. As we have said, the *prima facie* case made by evidence of the selection can only be overcome by clear and convincing proof that the taking of the specific land sought would be so unnecessary and unreasonable as to be oppressive and an abuse of the power. There is certainly no more reason to fear that the courts will lose sight of the necessities of any meritorious enterprises than that the condemning company if unrestrained might lose sight of the rights of the owner. It will hardly do to assume that the courts will abuse their powers and that condemnors will not. At any rate, the legislature has, in plain terms, vested the final determination in the court upon competent proof, and we have no power to hold otherwise." *State ex*

*rel. Postal Telegraph-Cable Co. v. Superior Court,* 64 Wash. 189, 116 Pac. 855.

It will be remembered that in the condemnation proceeding the relators did not offer any evidence, hence the relators may not now be heard to complain that the taking of the land sought would be so unnecessary and unreasonable as to be oppressive.

The judgment is affirmed.

STEINERT, C. J., GERAGHTY, TOLMAN, and MAIN, JJ., concur.